**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 1 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JOHNNY BLAZE, a/k/a Ruben Hur
Cedeno, a/k/a "Carl",

      Defendant-Appellant.

No. 97-1082

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### (D.C. No. 95-CR-367-S)

---

Harvey A. Steinberg (William R. Kelso with him on the briefs), Springer & Steinberg,
P.C., Denver, CO, for Defendant-Appellant.

Paula M. Ray (Henry L. Solano, United States Attorney, and Charlotte J. Mapes,
Assistant U.S. Attorney, with her on the briefs), Assistant U.S. Attorney, Denver, CO, for
Plaintiff-Appellee.

---

Before **PORFILIO**, **HOLLOWAY**, and **TACHA**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

In a trial that revealed a scenario of which Elmore Leonard would have been proud, Johnny Blaze was convicted of numerous counts of extortion and racketeering. On appeal, Mr. Blaze contends the court erred when it: (1) did not suppress evidence officers retrieved without a warrant from his locked briefcase; (2) refused to remove appointed counsel at Mr. Blaze's request; and (3) did not grant a mistrial when a witness mentioned a polygraph exam. In addition, Mr. Blaze asserts he was denied effective assistance of counsel. These contentions notwithstanding, we affirm.

## BACKGROUND

The saga begins with investment advice given California resident Wayne Pederson, a codefendant, by Thomas Carey, a stockbroker in that state.[1] On the strength of this advice, Mr. Pederson invested $28,000 for 30,000 shares in Star Casino, a company promoted by two Colorado financial consultants, Louis Scotti and Craig Edelman, through the medium of infomercials shown in the Los Angeles area. To Mr. Pederson's chagrin, he believed he lost most of his investment because the stock was significantly devalued when Mr. Edelman and Mr. Scotti sold their shares on the market. Mr. Pederson was further piqued because he lost $12,000 in another transaction he believed was promoted through Edelman and Scotti.

---

[1]At the time this tale was unfolding, Mr. Pederson used the pseudonyme, "Robert Pallmer." Even though that was the name employed by the people involved, we shall refer to him by his correct name.

Understandably provoked by this turn of events, Mr. Pederson threatened to file an arbitration action against Mr. Carey, the broker who recommended the investment. Mr. Carey evaded this attack by blaming Mr. Scotti and Mr. Edelman for the losses. When Mr. Carey attempted a recoupment for his client's misfortune from Scotti and Edelman, they refused to pay because they had no dealings with Mr. Pederson.

Mr. Pederson, undeterred and seriously bent upon retrieving his cash, proposed sending emissaries to Denver to convince Scotti and Edelman of the error of their ways. To facilitate this effort, Mr. Carey provided Pederson with personal information about the Denver promoters including home addresses, telephone numbers, license plate numbers, marital status, and schools their children attended. Mr. Carey gave Mr. Pederson $5,000 to fund the trip and tried unsuccessfully to obtain an unregistered gun for the occasion.

In May 1995, Mr. Pederson sent two agents, Fred Rousseau and Octavio Romero, to Denver with instructions to collect "a big sum of money" from Mr. Scotti and Mr. Edelman. The two men arrived at the promoters' Denver office and demanded money they claimed was owed to Pederson. When the intruders would not accept the promoters' denials of any knowledge of Mr. Pederson or a debt to him, Mr. Edelman called the police, who, upon their arrival, invited Mr. Rousseau and Mr. Romero to leave. Compliant, the men not only left the premises but also returned empty-handed to their principal in California.

When told of Mr. Rousseau's failed exploits some two months later, the defendant, Johnny Blaze, became very interested in trying his hand in collecting from the promoters. Claiming success in performing similar services in the past, Mr. Blaze asked for an introduction to Mr. Pederson.

Mr. Blaze, Mr. Rousseau, and a third man, Kelvin Blanton, met with Mr. Pederson at his home. Rousseau later testified Blaze told Pederson "[he could] just about guarantee that he [could] get the money this time." Blaze said he needed more men and $2,000 for expenses. Pederson responded with a check for $1,000 saying he would split expenses and profits equally with Mr. Blaze when the job was done. Blaze accepted the deal, and the men decided Blaze's mission was to collect over $50,000 from Scotti and Edelman.

A few days later, in the beginning of August, Blaze, Rousseau, Blanton and a fourth man traveled to Denver in quest of lucre. However, stymied because they were unable to locate Mr. Scotti's residence, they returned to California unrequited.

Undaunted, at the end of August, Blaze, Rousseau, Blanton, and two other men set out once again for Denver, this time in a 1996 Lincoln Town car rented in Blaze's name. During the trip, Blaze told Mr. Rousseau, the driver, not to speed because there was a gun in the car.

Upon arrival in Denver, the men secured a room at a hotel. As they unloaded the car, Mr. Rousseau saw Blanton remove a .38 caliber revolver and place it in his jacket.

That same gun, according to Rousseau, wound up in Mr. Blaze's waistband on the morning of their encounter with the Denver promoters.

That night, Blaze held a meeting to instruct each man on his role for the morrow. He established code names for them to use on the portable radios through which they were to communicate and instructed Rousseau to get a map of the city. The next morning, with the benefit of a map this time, the five emissaries found Mr. Scotti's house. Two men, including Rousseau, waited in the car while Blaze, Blanton, and a third man approached the house where, at about 7:00 AM, Mr. Blaze encountered Violet Andrews, Mr. Scotti's wife, who was watering plants in the front of the house.

In response to Mr. Blaze's solicitation, Ms. Andrews woke Mr. Scotti who walked to the front door, only to be greeted by the muzzle of a gun which Mr. Blaze meaningfully placed under his chin and then into his abdomen. Mr. Blaze told Mr. Scotti he owed a lot of money, and Blaze was there to collect it. Mr. Blaze then backed Mr. Scotti into the foyer of his house, while Blanton ushered his wife inside. Blaze ordered the third man to stay outside and locked the door behind them.

After escorting Mr. Scotti to the kitchen, Mr. Blaze said he was there to collect $125,000 Scotti had stolen from "the mob, the mafia." Mr. Scotti later testified that, while Mr. Blaze held the gun, he told Mr. Scotti he would have to "wire money right now" and "if this wasn't going to happen, then [his] wife was going to be raped and [his] children were going to be skinned."

Ms. Andrews testified Mr. Blaze made the three children eat their breakfast in the living room. This, according to Ms. Andrews, concerned the children, but she instructed them to "be very quiet" and told them to "eat their cereal." In an attempt to get the men out of the house, Mr. Scotti told Mr. Blaze he could get this done if they went to his office.

Mr. Blaze followed Mr. Scotti to his bedroom. While Mr. Scotti dressed, Mr. Blaze continued to make threats on his life. He also told Mr. Scotti he should be glad to have the opportunity to pay because Scotti's partner, Mr. Edelman, was not going to have that opportunity -- he was going to be killed. Before departing for Mr. Scotti's office, Mr. Blaze said he was going to leave some men behind to ensure Ms. Andrews did not call the police.

When they entered the garage to get into Mr. Scotti's car, Mr. Blaze gave Mr. Scotti an attention-getting punch in the ribs. Encouraged by that prelude, Mr. Scotti drove to his office in Mr. Blaze's company with the other men following in the Lincoln.

Upon arrival at the office, Mr. Blaze noticed an office safe and told Mr. Scotti to instruct an employee to open it. Mr. Blaze discovered $15,000 in cash in the safe and promptly pocketed it. When Mr. Edelman arrived, Mr. Scotti told him Mr. Blaze was there to collect $125,000 he claimed they owed.[2] He told Edelman not to "do anything

---

[2]Curiously, the amount demanded seemed to grow with the passage of time.

stupid" because there were people at his house and Mr. Blaze was "going to kill [his] family."

Scotti and Edelman then contacted Mr. Pierce, a friend in Arizona, and asked to borrow as much money as he could quickly get together. Mr. Pierce agreed to wire $50,000 as soon as his bank opened. Mr. Edelman relayed to Pierce wiring instructions from Mr. Blaze to send the money to a Chicago bank in the name of Sun Yu Leung. While waiting for the transfer confirmation, Mr. Blaze told Scotti and Edelman they had until the following Wednesday to come up with an additional $65,000. He then departed.

Later in the day, Mr. Blaze called Scotti and Edelman and told them he received the transfer in Chicago. He also told them that his "crew" would remain in the neighborhood and would be watching.

With $15,000 cash in hand and $50,000 wired to an account in Chicago, Mr. Blaze and Mr. Blanton were taken by their remaining confederates to the Denver International Airport for a flight back to California. Before departing, Mr. Blaze put the gun into his briefcase and placed the briefcase in the trunk of the Lincoln. Mr. Rousseau and the other two men then set out for California. During the trip, one of the men retrieved the gun from the briefcase and placed it behind the glove compartment.

While driving through Utah, Mr. Rousseau apparently forgot Mr. Blaze's entreaty about circumspection because he began to drive erratically, swerving in and out of traffic.

A concerned citizen, using his cellular phone, called the police, and the Utah Highway Patrol responded, stopping the Lincoln.[3]

Almost immediately, an officer placed Mr. Rousseau under arrest because he was driving without a license. Noting the authorized driver of the car, Mr. Blaze, was not with the vehicle, the officer contacted the agency that had rented the car. A person at the agency office advised the officer the rental contract had been breached and requested the officer hold the car for pick up.

While waiting for a rental agency employee to arrive, the officers discovered one of the other passengers had a prior conviction for concealed weapons. They then placed all three men in handcuffs "for [the officers'] safety." At this point, the officers believed they had stumbled on the tail end of a drug deal.

After asking each man what was in the trunk of the car, one of the officers opened it. He emptied all of the contents onto the road including Mr. Blaze's briefcase. The three men who had been in the car claimed all of the luggage except for the briefcase -- each said it belonged to their boss, Johnny Blaze. One officer attempted to open the locked briefcase but was only partially successful. Subsequently, while searching the passenger compartment, another officer found the gun.

Pursuing their suspicion about a drug deal, the officers called in a dog to sniff the briefcase. The dog alerted. The briefcase was then forcibly opened and marijuana was

---

[3]The entire encounter is on videotape that was admitted into evidence.

found inside. Additionally, documents including phone bills and hotel receipts linking Mr. Blaze to the Denver foray were also found in the briefcase.

After Mr. Rousseau was arrested, Mr. Blaze called the Utah Highway Patrol and said he owned the gun and the briefcase. He was informed the gun would be returned to the two men in the car who were not under arrest. He was also told that the briefcase presented a problem he would have to solve with the county prosecutor. Nevertheless, both the gun and the briefcase ultimately ended up in the possession of the FBI.

For two days after the Denver visitation, Mr. Blaze telephoned Mr. Scotti with new wiring instructions. Unknown to him, however, on the second day after the events that took place in their office, the two promoters had contacted federal authorities. In response, the FBI set up phone taps at Mr. Scotti's residence and his office which recorded a number of subsequent threatening calls and traced them to a California cell phone number. Those calls, however, originated from Oahu, Hawaii.

In the meantime, Mr. Carey, the California stockbroker, who had agreed to travel to Denver to pick up the remainder of the money for Pederson, was stopped by FBI agents upon his arrival at Denver International Airport. Agreeing to cooperate with the government, Mr. Carey allowed FBI agents to tape his conversations with Mr. Pederson.[4] Soon thereafter, Mr. Blaze, vacationing in Hawaii, was arrested in Honolulu, and an indictment was returned in the District of Colorado.

---

[4]All tapes were received into evidence and were played for the jury.

On September 20, 1995, a retained attorney entered an appearance on behalf of Mr. Blaze. Just over one month later, he moved to withdraw and asked the district court to appoint a federal public defender. The court granted the motion and, on November 29, 1995, counsel entered his appearance on behalf of Mr. Blaze. In February 1996, however, the defender filed a motion to withdraw because of a conflict of interest. The court granted the motion and appointed attorney John Tatum to represent Mr. Blaze.

Mr. Blaze and Mr. Tatum apparently did not mesh. Two months after his appointment, Mr. Tatum moved to withdraw at Mr. Blaze's request. After a hearing, the court denied the motion, but did appoint Mr. Steinberg, a second attorney, to act as co-counsel. Mr. Steinberg currently represents Mr. Blaze on this appeal.[5]

Prior to trial, Mr. Blaze moved to suppress the evidence obtained from the Utah stop and, in particular, the contents of his briefcase. The court, finding Blaze did not have standing to contest the stop, denied the motion.

Finally, on the eve of trial, the government asked Mr. Tatum to stipulate Mr. Blaze had possessed a Nokia cell phone. Mr. Tatum agreed and later signed a stipulation which was read to the jury on the first day of trial. About ten days into trial, Mr. Tatum realized he had made a mistake. Rather than stipulating to Mr. Blaze's possession of the Nokia, a

---

[5]Mr. Tatum filed a second motion to withdraw one month before trial, but it was also denied.

phone not connected to the threatening calls, he had stipulated Mr. Blaze possessed the Motorola phone used for that purpose.[6]

During trial, Mr. Scotti, the government's principal witness, volunteered he had agreed to take a polygraph examination. Mr. Blaze moved for a mistrial which the court denied.

The jury convicted Mr. Blaze on several counts of interference with commerce by threats or violence; interstate transportation in aid of racketeering; and use of interstate communications to extort money. The court dismissed one count of use of a firearm during a crime of violence and the jury acquitted him of one of the extortion counts. He was sentenced to 240 months on each remaining charge to run concurrently.

### ISSUES ON APPEAL

Mr. Blaze maintains the court should have suppressed the fruits of the Utah traffic stop. In addition, he claims he was denied effective assistance of counsel and the court should have granted his request that Mr. Tatum be removed from the case. Finally, Mr. Blaze contends the district court should have granted a mistrial when Mr. Scotti testified he offered to take a polygraph examination.

### A.  Motion to Suppress

_____

[6]There is some confusion in the record whether government counsel told Mr. Tatum he meant the Motorola phone or whether Mr. Tatum even read the stipulation which clearly states "the Motorola" cell phone.

Mr. Blaze maintains the officers' search of the trunk of the car and the briefcase was not lawful. After an evidentiary hearing, the district court held Mr. Blaze did not have standing to contest the searches, and, even if he did, the searches were reasonable.

In reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, and will accept the district court's factual findings unless they are clearly erroneous. *United States v. Lacey*, 86 F.3d 956, 971 (10th Cir. 1996). The ultimate determination of reasonableness under the Fourth Amendment is, however, a conclusion we review de novo. *Id.*

The district court held Mr. Blaze did not have standing to challenge either the stop and search of the car or the subsequent search of his briefcase. The Supreme Court has instructed only one whose rights were violated by a search may move to suppress the evidence obtained, and one who is merely aggrieved by the introduction of damaging evidence gathered as a consequence has no standing to contest the search. *Alderman v. United States*, 394 U.S. 165, 171-75 (1969). Therefore, we must examine whether Mr. Blaze suffered an invasion of a legitimate expectation of his personal privacy. *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978).

It is conceded Mr. Blaze leased but did not own the car, and under his contract with the rental agency, he was the only person authorized to drive it. When the Utah highway patrol officer stopped the vehicle, Mr. Blaze was not present; indeed, he was on a flight between Denver and California. Accordingly, Mr. Blaze's only legitimate

expectation of privacy in the car arises from whatever may be supported by his "leasehold" interest.

"While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated," *United States v. Salvucci*, 448 U.S. 83, 91 (1980), ownership alone is not dispositive. *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980). We must look to the totality of the circumstances, and "any precautions taken to exclude others or otherwise maintain a privacy interest will heighten the legitimate expectation of privacy in the protected area." *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 449 (9th Cir. 1983).

The government relies on three cases in which courts have found mere ownership of a car did not establish a sufficient expectation of privacy to allow the absent owner to challenge the search of the car. *See id.* (where owner "voluntarily turned her automobile over to [driver] for his exclusive use [and s]he took no precautions to safeguard any privacy interest she may have had in the automobile," she could not challenge seizure of cocaine in plain view on front seat); *United States v. One 1986 Mercedes Benz*, 846 F.2d 2, 4 (2d Cir. 1988) ("We believe that by lending the Mercedes to [driver], [owner] abandoned any legitimate expectation of privacy in the area searched and thus may not now contest the legality of the search."); *United States v. Nunn*, 525 F.2d 958, 959 (5th Cir. 1976) (not sufficient interest where owner was not driving pickup and aliens who made incriminating statements were lying in the open bed of the truck).

Mr. Blaze attempts to distinguish each of these cases by suggesting the evidence seized was in "plain view" or, at least, in the passenger compartment of the car. In contrast, he notes, in this case, the defendant's briefcase was locked in the trunk of the car. He argues, essentially, that he demonstrated a greater expectation of privacy by placing the briefcase in a locked trunk rather than in the passenger compartment.

While the location of Mr. Blaze's briefcase may affect his expectation of privacy in the search of the briefcase, it has no bearing on his expectation of privacy regarding the search of the car. It is undisputed he surrendered the car to his friends to drive to California. It is reasonable, therefore, to conclude he abandoned his privacy interest in the car as a whole. Thus, we hold he has no standing to challenge the search of the car.

The briefcase presents a different issue. It may be plausibly argued, when Mr. Blaze locked the briefcase and placed it in the locked trunk of his rental car, he evidenced a clear intent to retain a privacy interest in the contents of the briefcase.

The government relies on *United States v. Austin*, 66 F.3d 1115 (10th Cir. 1995), where the defendant asked a stranger in an airport to watch his unlocked bag. After agreeing, the stranger began to feel uncomfortable and called security. Security officers brought the bag to lost and found, and, during an inventory of the bag, discovered heroin. We held, "[b]y leaving his bag in the possession and control of [the stranger], defendant assumed the risk that [the stranger] would allow the authorities access to the bag."[7]

---

[7]Contrary to Mr. Blaze's assertion, we did not hold the defendant had abandoned
(continued...)

- 14 -

This case is distinguishable. Mr. Blaze did not give his bag to strangers; to the contrary, he specifically entrusted it to his associates. Moreover, he placed the bag in the locked trunk of the car, not out in the open of an airport terminal. Finally, he locked the briefcase. We therefore believe Mr. Blaze had a reasonable expectation of privacy in the briefcase; hence, he had standing to challenge its search.

Our review does not end at this point, though. Assuming Mr. Blaze had standing to contest both searches, the district court went on to find the search of the car and the search of the briefcase were reasonable. Mr. Blaze disagrees.

The court held the search of the car was valid as: (1) a search incident to an arrest; or (2) a valid inventory search. On appeal, the government does not address the first ground, seemingly conceding the point.[8] Instead, the government insists the search of the car was a valid inventory search.

> An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment ... designed to effect three purposes: protection of the owner's property, protection of the police against claims of lost or stolen property, and protection of the police from potential danger. [Citations omitted.] However, inventory searches are only reasonable if conducted according to standardized procedures. [Citations omitted.] An inventory search must not be a ruse for a general rummaging in order to

---

[7](...continued)
the bag. **United States v. Austin**, 66 F.3d 1115, 1119 (10th Cir. 1995) ("Based on these facts, we conclude that defendant intended to retain a privacy interest in the luggage.").

[8]The concession is appropriate. Although an officer can search the passenger compartment of a vehicle incident to a lawful arrest, this right does not extend to the trunk because the trunk is not within the reach of the arrestee. **United States v. Wright**, 932 F.2d 868, 878 (10th Cir. 1991).

discover incriminating evidence, but rather an administrative procedure designed to produce an inventory.

*United States v. Haro-Salcedo*, 107 F.3d 769, 772-73 (10th Cir. 1997).

The search in this case does not meet those qualifications. The officers involved admitted they thought they had stumbled on a drug deal. The videotape shows, before opening the trunk, an officer asked each of the passengers of the car what luggage was in the trunk. In particular, the officer asked each person what bags, if any, belonged to them, and whether there were bags in the trunk that did not belong to them. Each person claimed at least one bag as his own, and each also said the trunk contained a brown briefcase that belonged to their boss, Johnny Blaze.

After asking these questions, the officer opened the trunk. He and another officer removed the bags and placed them on the ground. The officers admitted when they opened the trunk they were searching for contraband, and at no time did the officers make any attempt to catalogue the contents. One of the officers then attempted to open Mr. Blaze's briefcase by turning the combination locks, and, in fact, did open one side; however, he was unable to open the second combination lock.

The officers admitted they had an investigatory purpose. They were not following any set procedures and were not even attempting to catalogue the items in the trunk. Moreover, by the time they opened the trunk, they already had called the rental agency and knew one of its employees was coming to reclaim the car. It is clear on the videotape that the officers believed they could not turn the car over to any of the persons who were

originally in the car. They explained this to the former occupants numerous times. Yet, knowing the car was going to its owner, and knowing the trunk had bags belonging to these men, the officers had to do something with the bags -- somehow those bags had to get from the trunk to their owners.

In addition, the officers had placed Mr. Rousseau under arrest, and they knew one of the other passengers had convictions for concealed weapons and assault. Upon this discovery, the police also placed him and the third passenger in handcuffs "for their protection."[9] This turn of events resulted in a conundrum. First the officers could not allow three men in handcuffs to retrieve bags with unknown contents from the trunk of a car; especially knowing one of them has been convicted of carrying a concealed weapon. Second, the men admitted one of the bags did not belong to any of them. At that point, the officers did not know whether the bag was stolen or if it contained contraband. Consequently, it does not strain credulity to assume this bag, Mr. Blaze's briefcase, would have been impounded at least until officers could contact the purported rightful owner.

Under these circumstances, we believe the need to remove the bags from the trunk inevitably led the officers to place Mr. Blaze's briefcase on the ground. Taking all factors into consideration, we believe this was reasonable. As the district court aptly noted:

> [E]ven assuming [Mr. Blaze] had some expectation of privacy in the
> vehicle, it appears clear that objectively reasonable conduct under the
> circumstances would be that the officers were required to take the briefcase
> and the suitcases and check out the vehicle before turning it back over to

---

[9]It is clear in the video the officers were concerned about their safety.

[the rental agency], who was clearly the person who had the ownership interest in this vehicle.

Once the bags were removed from the trunk, the officers called in a trained dog to sniff them. Had the officers' prior attempt to open the locked briefcase succeeded, Mr. Blaze may have had a stronger claim; however, the briefcase was not opened until after the dog alerted to it. Once a dog alerts to a container, probable cause exists to open and search it. *United States v. Ludwig*, 10 F.3d 1523, 1527-28 (10th Cir. 1993).

Following the logical steps taken by the officers and the legitimate inferences that can be drawn from those events, we believe the "inevitable discovery" theory applies. Under that theory we have recognized "if evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible." *C.f. Haro-Salcero*, 107 F.3d at 773 (citations and quotations omitted). We hold, therefore, the search of the briefcase was lawful under these circumstances.

## B. Ineffective Assistance of Counsel

Mr. Blaze contends Mr. Tatum was grossly ineffective when he signed the stipulation conceding Mr. Blaze had possession of the telephone used to make the phone calls that were the foundation for the seventeen counts of extortion of which the defendant was convicted. Apparently, neither Mr. Blaze nor Mr. Steinberg knew of the stipulation at the time it was made. Mr. Blaze states in his brief, "[t]here is no explanation in the record as to why Tatum signed the Stipulation...." However, the record does reveal Tatum thought he was signing a stipulation about another unrelated cell

phone.  We are consequently at a loss to understand this turn of events, and the record is in no way helpful in solving the issue.

Claims of ineffective assistance of counsel brought on direct appeal "are presumptively dismissible, and virtually all will be dismissed."  *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc).  We deal with those claims in this fashion because:

> A factual record must be developed in and addressed by the district court in the first instance for effective review.  Even if evidence is not necessary, at the very least counsel accused of deficient performance can explain their reasoning and actions, and the district court can render its opinion on the merits of the claim.

*Id.*  Instead, "a claim of ineffective assistance of counsel which requires the development of a record, will not be heard on direct appeal, but must be brought in a collateral proceeding pursuant to 28 U.S.C. § 2255."  *United States v. Yates*, 22 F.3d 981, 986 (10th Cir. 1994).  Accordingly, we shall not review the issue in this appeal.

### C.  Removal of Mr. Tatum

Mr. Blaze twice asked the court to remove Mr. Tatum from his case.  Both times, the court held a hearing and denied the request.  The court did, however, appoint a second attorney for Mr. Blaze to act as a "communicator and facilitator."  Nevertheless, Mr. Blaze now argues the court erred when it did not remove Mr. Tatum as lead attorney.  We review this issue for an abuse of discretion.  *United States v. Johnson*, 961 F.2d 1488, 1490 (10th Cir. 1992).

"To warrant a substitution of counsel, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *United States v. Padilla*, 819 F.2d 952, 955 (10th Cir. 1987) (quotations and citations omitted). Here, Mr. Blaze repeatedly alleged an inability to communicate with Mr. Tatum. To rectify this situation, the court appointed Mr. Steinberg. At the second hearing, Mr. Steinberg testified regarding the breakdown in communications between Mr. Blaze and Mr. Tatum:

> Mr. Blaze has absolutely no confidence, wrongfully or rightfully,... in Mr. Tatum's abilities. They don't talk. They don't communicate. They argue. They cajole. And it's not fruitful for Mr. Blaze's defense, and I don't think it's good for Mr. Tatum's health.

At both hearings, the trial court commented on Mr. Tatum's abilities and competency as an attorney. In its order denying the second motion to withdraw the court stated, "[i]t appears from the statements of both counsel and the Defendant that this arrangement has worked in a satisfactory manner and both Mr. Blaze and Mr. Tatum are able to adequately communicate with Mr. Steinberg." While the district court's solution may have produced some strange and awkward results, we cannot say under the circumstances the court erred by not finding facts that would meet the *Padilla* test. We consequently hold defendant has not shown the court abused its discretion.

### D. Testimony Concerning Polygraph Examination

Mr. Blaze claims the court should have declared a mistrial when Mr. Scotti volunteered he agreed to take a polygraph examination. Again, we review for an abuse of discretion. *United States v. Wacker*, 72 F.3d 1453, 1466 (10th Cir. 1996).

During direct examination of Mr. Scotti, the following exchange took place:

Q:[by the government]: Did you agree to do anything with the FBI?

A:[by Scotti] Yes, I did.

Q: Can you tell the jury what you agreed to do?

A: I signed papers with them agreeing to allow them to record conversations between myself and any of the people involved in this entire incident....

Q: Did you agree to anything else?

A: I agreed to take a polygraph test.

Q: Did you agree to do anything else?

MR. TATUM: Judge, can we approach the bench?

THE COURT: Sustain your objection. I don't want to hear anything more about that.

At a later break in the proceedings, Mr. Blaze asked for a mistrial. He maintained the only inference a jury could draw from the statement, "I agreed to take a polygraph test," was that Scotti passed the polygraph; otherwise, the government would not have permitted him to testify. The court acknowledged the evidence was inadmissible; however, it did not think the single mention of the word, "polygraph," warranted a mistrial. In addition, although Mr. Blaze did not ask for an instruction, the court chose

- 21 -

not to give one because it did not want to highlight any prejudicial effect of the statement.

Mere reference to polygraph testing does not require a mistrial. *See, e.g.*, ***United States v. Walton***, 908 F.2d 1289, 1293 (6th Cir. 1990). "Where the witness is not a government official, the question is not whether the witness intended to prejudice the jury or bolster his credibility but whether the reference was harmless." ***Id.***

Here, Mr. Scotti was a critical witness for the government and his credibility was a central issue in the case. In fact, the defense attacked his credibility by showing on cross-examination he: (1) settled a fraud lawsuit for $36,000; (2) created a shell corporation to shelter taxable assets; (3) he knew his partner had two felony convictions and had lost his stockbrokers license; and (4) he failed to produce documents in response to a subpoena. The fact he agreed to take a polygraph would certainly have bolstered his credibility, despite that attack, by leading the jury to believe he was telling the truth about the current situation.

However, like the trial court, we do not believe this single unsolicited mention of a polygraph warrants a new trial.[10] This is true particularly in light of the other evidence of guilt established at trial. For instance, the government presented numerous tapes at trial in which Mr. Blaze can be heard threatening Mr. Scotti's life and the lives of his wife and children. In addition, two of Mr. Blaze's accomplices testified Mr. Blaze was the

---

[10]Despite some moments of confusion over the issue in the trial court, it is clear the witness did not say he took the exam, or was even asked to do so. Thus, while Mr. Blaze would like us to believe there was an inference inherent in the testimony that the witness had successfully "passed" a polygraph exam, we cannot agree.

mastermind of the entire project.  They also provided details of almost every aspect of the

case.  The evidence of guilt is clearly overwhelming.  The court did not abuse its

discretion in refusing to grant a mistrial.

### E.  Cumulative Error

Finally, Mr. Blaze asserts he is entitled to a reversal because of the cumulative

effect of all of the errors in his trial.  ***United States v. Glass***, 128 F.3d 1398, 1409-10

(10th Cir. 1997).  As we have pointed out, there are no errors to aggregate.


**AFFIRMED**.