**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 13, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MICHAEL E. PETTIT,

      Defendant - Appellant.

No. 14-4043

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:13-CR-00286-DS-1)**

---

Daphne A. Oberg, Assistant Federal Public Defender (Kathryn N. Nester, Federal Public Defender, and Scott Keith Wilson, Assistant Federal Public Defender, with her on the briefs), Salt Lake City, Utah, for Defendant - Appellant.

Diana Hagen, Assistant United States Attorney (Carlie Christensen, Acting United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff - Appellee.

---

Before **BRISCOE**, Chief Circuit Judge, **KELLY** and **SEYMOUR**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

In 2013, Defendant-Appellant Michael E. Pettit was indicted on one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), after police discovered 2.5 kilograms of cocaine hidden in a vehicle he was driving.  Mr. Pettit filed a motion to suppress, which the district court denied following an evidentiary hearing.  United States v. Pettit, No. 2:13CR00286, 2013 WL 5494664 (D. Utah Oct. 2, 2013).  A jury found Mr. Pettit guilty, and he was sentenced to ten years of imprisonment followed by eight years of supervised release.

On appeal, Mr. Pettit asserts that the district court erred by denying his motion to suppress because the police improperly extended a lawful traffic stop based on factors failing to give rise to objectively reasonable suspicion of criminal activity.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

Background

On the afternoon of April 17, 2013, a Utah Highway Patrol Trooper, Thomas Simpson, observed Mr. Pettit drive across the fog line multiple times.  He was traveling approximately 45 miles per hour and had just passed through a "snow burst" on mountainous terrain.  The snow had subsided, and the roads were dry.

The trooper stopped Mr. Pettit at 3:32 p.m. and approached the vehicle. Mr. Pettit stated that he was "not from around here" and that the snow burst had "scared the hell out" of him. I R. 22, II R. 82–83. The trooper explained he had stopped Mr. Pettit because he had crossed the fog line and asked for his license and registration. Mr. Pettit stated that he was not the owner of the vehicle, and he handed over the registration but not his driver's license. The trooper asked who the owner of the car was, and Mr. Pettit gave the first name of the woman listed on the registration, Annette. During this exchange, Mr. Pettit's lower body was "kind of moving nervously." I R. 23.

The trooper asked Mr. Pettit for details about his travel plans, including where he was coming from and where he was going. Mr. Pettit explained that he had flown to California to pick up his friend's car and drive it back to Kansas. The trooper then asked Mr. Pettit if he had any luggage, since he did not see any bags in the passenger compartment. The trooper believed it was abnormal for a person driving across the country to have no bags, snacks, or garbage next to him in the car. II R. 84. Mr. Pettit indicated that he had a bag in the trunk, along with luggage belonging to his friend. He then said to the trooper, "[Y]ou make me kind of nervous." Id. at 86. The trooper asked for permission to look in the trunk, and Mr. Pettit agreed.

Mr. Pettit pulled the release for the trunk, and the trooper asked Mr. Pettit to stay seated and requested his driver's license a second time. Mr. Pettit

repeated that the trooper was making him nervous. Id. at 92. The trooper testified that "[m]ost people don't tell me they are nervous, but he told me twice within 25 seconds." I R. 32. Mr. Pettit began flipping through his wallet to produce his driver's license. The trooper noticed that Mr. Pettit passed over a California license before removing a Missouri license. As Mr. Pettit handed over the Missouri license, the trooper noticed that "[h]is whole arm shook very nervously, which is different than the general public." II R. 85. According to the trooper, he has had extensive experience with motorists and, while many people display small jitters when pulled over, generally "their whole arm is not shaking nervously." Id. at 86. On Mr. Pettit's Missouri license, the label "Nondriver" was clearly printed. Id. at 87.

The trooper then confirmed that he had Mr. Pettit's consent to check the bags in the trunk, and he spent about one minute conducting a "pat search" and looking for anything "that the driver would be nervous about after he told me he was nervous"—such as weapons, drugs, or bodies. Id. at 88. He did not find any contraband during this cursory inspection, and he returned to his patrol car to run a driver's license check for Missouri and California while he filled out a citation. Dispatch indicated that both of Mr. Pettit's licenses were suspended. However, everything else was normal; the vehicle had not been reported stolen, and it was properly registered and insured.

After processing a citation and completing some paperwork, the trooper returned to the vehicle at 3:43 p.m. At this time, the trooper did not return Mr. Pettit's driver's license or hand him a citation. Instead, he questioned Mr. Pettit further. First, he asked how well Mr. Pettit knew the owner of the car, to which Mr. Pettit replied that he had known her for around three-and-a-half years. He asked whether Mr. Pettit was aware that his Missouri and California licenses were suspended, and Mr. Pettit said that he was not. He asked for additional details about Mr. Pettit's travel plans, and Mr. Pettit stated that he offered to help pick up his friend's car because she had to fly out to help her father deal with a health issue. Mr. Pettit did not know why his friend had initially driven her car to California. The trooper testified that he "found it very suspicious that a friend of three years had called him to go pick up a car and Mr. Pettit never knew why she was down there to begin with." Id. at 94.

The trooper then asked Mr. Pettit for consent to search the entire car, which Mr. Pettit provided. When the trooper asked Mr. Pettit whether his friend had paid for him to fly out to California to pick up the car, Mr. Pettit responded that "they did." Id. at 96. During the trooper's search, he radioed dispatch to request a criminal records check, which revealed that Mr. Pettit had multiple arrests for felonies and other drug offenses. The trooper then discovered $2,000 in a suitcase containing male clothing in the trunk. Mr. Pettit said the cash was from

his "old man." Id. at 97. According to the trooper, large amounts of cash can suggest the transportation of contraband such as narcotics. Id. at 97–98.

While the trooper continued his search, two canine officers arrived on the scene to assist. At 3:58 p.m., fifteen minutes after the trooper completed Mr. Pettit's original traffic citation, a drug detection dog began sniffing the outside of the vehicle and immediately alerted to the scent of drugs. A further search revealed over 2.5 kilograms of cocaine hidden in a spare tire in the trunk.

Discussion

On appeal, Mr. Pettit argues that the district court erred in denying his motion to suppress the drug evidence because the trooper unconstitutionally extended his detention based on "hunches and unjustified generalizations." Aplt. Br. 6–7. He argues that the district court applied a "truncated form of totality review." Id. at 7. Rather than addressing the "disconnected nature of the trooper's generalizations," the court added up the trooper's stated factors "numerically" to find reasonable suspicion. Id. He contends that, viewing the factors properly and in totality, the court should have found that the extended detention was not warranted.

When reviewing a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of

reasonableness under the Fourth Amendment. United States v. Vazquez, 555 F.3d 923, 927 (10th Cir. 2009). We defer to all reasonable inferences made by law enforcement officers in light of their knowledge and professional experience distinguishing between innocent and suspicious actions. United States v. Winder, 557 F.3d 1129, 1133 (10th Cir. 2009); United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998).

The Fourth Amendment guarantees the right of the people to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; see also Mapp v. Ohio, 367 U.S. 643, 655–56 (1961) (incorporating the Fourth Amendment's provisions against the states through the Fourteenth Amendment). A traffic stop is a seizure for purposes of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Laughrin, 438 F.3d 1245, 1247 (10th Cir. 2006).

It is well-established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings. United States v. Pena-Montes, 589 F.3d 1048, 1059–60 (10th Cir. 2009); United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004). An officer may also inquire about the driver's travel plans, United States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001), and ask about matters unrelated to the stop, Muehler v. Mena, 544 U.S. 93, 101 (2005).

Generally, an officer may also request consent to search a driver's luggage. Florida v. Bostick, 501 U.S. 429, 435 (1991).

However, a lawful traffic stop may not extend beyond the time reasonably required to effectuate its purpose. Rodriguez v. United States, 135 S. Ct. 1609, __ (2015); Illinois v. Caballes, 543 U.S. 405, 407 (2005). Continued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a "reasonable suspicion" that the detained person is engaged in criminal activity. United States v. Bradford, 423 F.3d 1149, 1156–57 (10th Cir. 2005); Rosborough, 366 F.3d at 1148.

The Supreme Court has defined "reasonable suspicion" as a "particularized and objective basis for suspecting" criminal conduct under a totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417–18 (1981). "Although the government bears the burden of proving the reasonableness of an officer's suspicion, reasonable suspicion is not, and is not meant to be, an onerous standard." United States v. Kitchell, 653 F.3d 1206, 1219 (10th Cir. 2011). Reasonable suspicion requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause to effect an arrest. United States v. Esquivel-Rios, 725 F.3d 1231, 1236 (10th Cir. 2013). "To satisfy the reasonable suspicion standard, an officer need not 'rule out the possibility of innocent conduct,' or even have evidence suggesting 'a fair probability' of criminal activity." Id. (quoting Poolaw v. Marcantel, 565 F.3d 721, 736 (10th

- 8 -

Cir. 2009)). Indeed, we have held that factors consistent with innocent travel may contribute to reasonable suspicion. United States v. Valles, 292 F.3d 678, 680 (10th Cir. 2002). As long as an officer has "a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004).

Since Mr. Pettit crossed over the fog line multiple times in violation of traffic laws, the parties agree that the initial stop was lawful. They also agree that the initial stop concluded at 3:43 p.m., when the trooper returned to Mr. Pettit's vehicle after completing his traffic citation. At that time, the trooper could have handed Mr. Pettit his citation, returned his driver's license, and informed him that he was free to leave. Instead, the trooper questioned Mr. Pettit further and requested consent to conduct a more thorough search of the vehicle. Because the trooper never returned Mr. Pettit's documents, the encounter did not become consensual. United States v. Guerrero-Espinoza, 462 F.3d 1302, 1308–09 (10th Cir. 2006). Thus, the parties' central disagreement is whether, by 3:43 p.m., reasonable suspicion existed that Mr. Pettit was engaged in illegal conduct, warranting his extended detention. If Mr. Pettit was detained beyond 3:43 p.m. without reasonable suspicion, then the fruits of the subsequent search are inadmissible. See Wong Sun v. United States, 371 U.S. 471, 484 (1963).

We evaluate each of the factors supporting reasonable suspicion separately and in aggregate.[1]  Salzano, 158 F.3d at 1111.  Although standing alone each of these factors is subject to possible innocent explanation, in aggregate they demonstrate that the trooper had objectively reasonable suspicion to extend Mr. Pettit's detention.  United States v. Arvizu, 534 U.S. 266, 277–78 (2002).

A.      Nervousness

Mr. Pettit first challenges his apparent nervousness as a basis for reasonable suspicion.  We repeatedly have held that, in the usual course, "nervousness is of limited significance in determining reasonable suspicion" because "it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity."  Salzano, 158 F.3d at 1113.  Ordinary nervousness alone cannot serve as the basis for reasonable suspicion.  United States v. Santos, 403 F.3d 1120, 1127 (10th Cir. 2005).  We look only for signs of nervousness "beyond those normally anticipated during a citizen-police encounter."  Salzano, 158 F.3d at 1113; see also Santos, 403 F.3d at 1127.  Further, we require "specific indicia that the defendant's nervousness was extreme" and will not give credit to

---

[1]  We decline to address Mr. Pettit's erratic driving pattern, a factor the district court considered in denying the motion to suppress.  Pettit, 2013 WL 5494664, at *5.  The government does not rely on this factor on appeal.  Aplee. Br. 8 n.1.

"an officer's naked assertion."  United States v. Simpson, 609 F.3d 1140, 1148 (10th Cir. 2010).

Here, nervousness does not stand alone in supporting objectively reasonable suspicion; as discussed below, Mr. Pettit's nervousness was only one of several relevant considerations.  Additionally, the trooper described several specific indicia of abnormal nervousness.  Mr. Pettit's lower body was "moving nervously" when he was first stopped, and his whole arm shook when he handed the trooper his driver's license.  See United States v. Davis, 636 F.3d 1281, 1292 (10th Cir. 2011) (considering a trooper's testimony that the defendant was "so nervous that he was just shaking so bad, he was really, really nervous"); Simpson, 609 F.3d at 1148 (considering that the trooper could see the defendant's body "trembling" even after he was assured he would not get a ticket).  Most importantly, Mr. Pettit expressly stated that the trooper was making him nervous twice within 25 seconds—first when the trooper asked him about his luggage and then after the trooper requested his license, which was suspended.  Mr. Pettit's behavior was unusual in light of the trooper's experience with motorists.

Mr. Pettit cites several cases where we have discounted perceived signs of nervousness as irrelevant to a finding of reasonable suspicion.  Yet, the evidence here is more powerful than the evidence presented in those cases.  For example, the single sign of nervousness exhibited by the defendant in Salzano was that his hands were shaking, which the officer described as "*a little* nervous."  158 F.3d at

1113 (emphasis added). In <u>United States v. Wood</u>, we discounted the trooper's subjective assessment of nervousness due to the "generic" nature of his description. 106 F.3d 942, 948 (10th Cir. 1997). Mr. Pettit highlights our statement in <u>Wood</u> that the trooper had no prior acquaintance with the defendant that would enable him to contrast his behavior during the traffic stop to his usual demeanor. <u>Id.</u>; <u>see also</u> <u>Simpson</u>, 609 F.3d at 1147–48. Yet, we have never held that prior acquaintance is a requirement for a finding of unusual nervousness. Indeed, such a requirement would effectively eliminate nervousness as a factor supporting reasonable suspicion, since officers rarely know citizens they stop for traffic violations.

Mr. Pettit offers a plausible innocent explanation for his nervousness: he was rattled by the snow burst he had just encountered. However, the existence of a plausible innocent explanation does not preclude a finding of reasonable suspicion. "Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further." <u>United States v. Cortez-Galaviz</u>, 495 F.3d 1203, 1208 (10th Cir. 2007). And Mr. Pettit does not persuasively argue that it would be objectively unreasonable to infer that the trooper's presence, rather than the snow storm, was the cause of Mr. Pettit's nervousness. Indeed, Mr. Pettit expressly stated as much twice within 25 seconds.

Thus, given the trooper's relatively detailed description of Mr. Pettit's abnormal nervousness, the district court properly considered his demeanor alongside other relevant factors in finding the trooper had reasonable suspicion to extend the traffic stop.

B.       Unusual Travel Plans

We have consistently held that "[i]mplausible travel plans can contribute to reasonable suspicion." Santos, 403 F.3d at 1129; see also United States v. White, 584 F.3d 935, 951 (10th Cir. 2009). Mr. Pettit argues that the district court erred by relying on statements concerning his travel plans made during his unlawful detention—that is, after 3:43 p.m., when the trooper could have issued his citation and returned his driver's license. Mr. Pettit is correct that reasonable suspicion of illegal activity must have existed prior to 3:43 p.m. in order for the trooper to further detain and question him. Bradford, 423 F.3d at 1156–57.

Yet, contrary to Mr. Pettit's assertions, the trooper obtained enough detail about Mr. Pettit's unusual travel plans before 3:43 p.m. to contribute to an objectively reasonable suspicion of criminal activity. By the time he had completed Mr. Pettit's citation, the trooper had learned that Mr. Pettit was driving a vehicle registered to a third party who was not present. In the trooper's professional experience, and in our case law, driving a vehicle registered to an absent third party can indicate drug trafficking. See, e.g., United States v.

Ludwig, 641 F.3d 1243, 1249 (10th Cir. 2011); United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991).

Furthermore, by 3:43 p.m. the trooper had learned that Mr. Pettit had flown to California to pick up the vehicle he was now driving one way across the country alone. Of course, we have held that "a one-way flight in one direction and a one-way rental vehicle in the other direction is not the type of unusual itinerary that gives rise to reasonable suspicion." United States v. Karam, 496 F.3d 1157, 1165 (10th Cir. 2007). And we have been "reluctant to deem travel plans implausible . . . where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make." Simpson, 609 F.3d at 1149. For example, the defendant in Wood, an "unemployed painter," informed a trooper that he was driving a rental car one way across the country after visiting California with his sister on vacation. 106 F.3d at 946. His sister had returned by plane, while he chose to drive to enjoy the scenery. Id. at 947. We held that those travel plans could not contribute to reasonable suspicion because "[t]here is nothing criminal about traveling by car to view scenery." Id.; see also Salzano, 158 F.3d at 1112–13 (holding that a defendant's travel plans were unusual but not suspicious when he was driving a rented motor home across the country on vacation).

Yet, Mr. Pettit was not driving a vehicle rented in his own name across the country on an extended vacation, but rather a vehicle registered to an absent third

- 14 -

party as a purported favor. The trooper explained that, in his experience, this travel pattern is consistent with that of a drug courier. And, while Mr. Pettit's travel plans may not have been so strange or implausible as to independently suggest criminal activity, they were worthy of consideration alongside several other suspicious factors. Karam, 496 F.3d at 1165.

C. Multiple Suspended Driver's Licenses

Perhaps most importantly, Mr. Pettit challenges the trooper's consideration of his two suspended licenses in formulating objectively reasonable suspicion, arguing that the fact of their suspension "advances the inquiry very little, if at all." Aplt. Br. 21. However, the Tenth Circuit has held specifically that driving with a suspended license can "contribute to the formation of an objectively reasonable suspicion of illegal activity." United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998) (citing United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995)); see also United States v. Pack, 612 F.3d 341, 361 (5th Cir. 2010) (holding that the defendant's "suspended license could have contributed to [the trooper's] reasonable suspicion of criminal activity, since licenses are usually suspended for less than law abiding conduct").

Further, Mr. Pettit's two suspended licenses might have amplified the implausibility of his travel plans. The trooper reasonably could have doubted that Mr. Pettit would volunteer to help a friend transport her car across the country, alone, when he lacked a valid license. Based on his professional experience, the

trooper could have concluded that a driver would assume the risk of driving without a license only if he was well compensated, such as in the course of an illicit drug deal. We acknowledge that an officer could have reached an opposite, innocent conclusion—that a driver would be unlikely to transport contraband if suspended licenses might arouse the suspicion of law enforcement. But, again, we need not rule out the possibility of innocent conduct in order to find reasonable suspicion. Poolaw, 565 F.3d at 736.

Additionally, the trooper requested Mr. Pettit's driver's license twice before Mr. Pettit produced a license clearly labeled "Nondriver." And, when Mr. Pettit produced the license, he passed over a suspended California license. Although these actions are not independently incriminating, there is no apparent error in the trooper's inference that Mr. Pettit was attempting to hide or otherwise avoid producing one or both of his suspended licenses.

Mr. Pettit argues that we should discount his license suspensions in light of our approach to previous criminal convictions. We have been cautious of lending excessive weight to criminal convictions, holding that a criminal record alone cannot give rise to reasonable suspicion. "If the law were otherwise, any person with any sort of criminal record . . . could be subjected to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification at all." Wood, 106 F.3d at 948 (quoting United States v. Sandoval, 29 F.3d 537, 543 (10th Cir. 1994)). Yet, crucially, the government

need not rely on Mr. Pettit's suspended licenses alone to support reasonable suspicion. Thus, the licenses, combined with several other suspicious factors, are relevant. Id. (discounting reliance on prior criminal convictions "[g]iven the near-complete absence of other factors which reasonably gave rise to suspicion").[2]

D.    Initial Search

Finally, Mr. Pettit argues that the trooper's initial fruitless search of the trunk militates against a finding of reasonable suspicion. Aplt. Br. 25. Indeed, we have held that courts must look at factors weighing against reasonable suspicion as well as factors supporting such a finding. United States v. Valenzuela, 365 F.3d 892, 897 (10th Cir. 2004). However, the trooper's first search occurred prior to the records check and many of his questions, took little time, and was only cursory. Pettit, 2013 WL 5494664, at *1. Thus, we agree with the district court that the results of the search are entitled to little weight.

E.    Totality of the Circumstances

Although each of the above factors—Mr. Pettit's abnormal nervousness, unusual travel plans, and multiple suspended licenses—may not independently provide reasonable suspicion of illegal activity, taken as a whole they establish

---

[2] The government argues that, since the trooper observed Mr. Pettit driving with a suspended license and therefore had probable cause to arrest him, Utah Code Ann. § 53-3-227, his detention was necessarily lawful. We have rejected this argument. Courtney v. Oklahoma ex rel. Dep't of Pub. Safety, 722 F.3d 1216, 1222 (10th Cir. 2013). In any event, the reasonable suspicion standard has been satisfied.

- 17 -

reasonable suspicion supporting Mr. Pettit's extended detention. <u>See</u> <u>United States v. Cervine</u>, 347 F.3d 865, 871 (10th Cir. 2003) ("Reasonable suspicion may exist even if each of the factors alone is susceptible of innocent explanation.").

AFFIRMED.