FILED
United States Court of Appeals
Tenth Circuit

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

November 22, 2021

Christopher M. Wolpert
Clerk of Court

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ARNOLD DEVONNE BUTLER,

    Defendant - Appellant.

No. 20-8037
(D.C. No. 2:19-CR-00100-SWS-1)
(D. Wyo.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **HARTZ**, **McHUGH**, and **CARSON**, Circuit Judges.

_____

Arnold Devonne Butler was convicted of numerous drug-related offenses after police found large quantities of controlled substances concealed in a car he was transporting on his flatbed tow truck. He appeals the district court's denial of his motion to suppress the evidence found during the traffic stop and the court's admission of certain co-conspirator statements at his trial. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.    Background

### A.    The Traffic Stop

On May 14, 2019, Wyoming Highway Patrol Trooper Joshua Gebauer was driving eastbound on I-80 near Cheyenne, Wyoming, when he observed a flatbed tow truck transporting a Ford Fusion sedan. He noted the truck had a California license plate, indicating it had crossed state lines. Trooper Gebauer believed the truck was an interstate commercial vehicle subject to Wyoming statutes and regulations. As he pulled alongside the truck, he noticed the straps tying down the Ford Fusion were loose, flapping in the wind, and fraying in places, presenting a potential load securement violation. In addition, the only Department of Transportation (DOT) number on the cab—which ended in "CA"—appeared to be a California DOT number rather than the required United States DOT number.

At approximately 10:03 a.m., Trooper Gebauer activated his lights and stopped the tow truck to address these issues and to conduct a Level 1 commercial vehicle inspection. He testified at the suppression hearing that a Level 1 inspection ultimately involves a physical inspection of the vehicle, but includes several previous steps beginning with the entry of a USDOT number in the online inspection program. For safety reasons, Trooper Gebauer generally conducts such a Level 1 inspection off of the roadway, away from traffic.

Upon approaching the tow truck, Trooper Gebauer observed that the rear license plate on the Ford Fusion had been removed, while a California license plate remained on the front of the car. He also noted the front and back windshields of the

Ford Fusion were covered with dust and grime, giving the appearance it had not been recently driven.

Trooper Gebauer approached the tow truck and greeted Butler, who was the driver and sole occupant. He asked Butler for his license and registration, insurance, medical card, annual inspection for the truck, and the bill of lading for the Ford Fusion. Butler had an unexecuted salvage title for the Ford Fusion but no bill of lading. Trooper Gebauer asked Butler if he was keeping track of his driving hours, as required for interstate commercial vehicle operation. Because Butler had no logbook to track his duty status, Trooper Gebauer intended to place Butler out of service for ten hours, pursuant to the Commercial Vehicle Safety Alliance. When asked for his USDOT number allowing for interstate transportation, Butler stated both that he did not believe he needed it and that he did not have it with him.

Trooper Gebauer inquired about Butler's travel history and plans. Butler said he had stayed the previous night with family in Colorado Springs, Colorado, after delivering a different vehicle there around 7:00 p.m. He claimed that a person—who he identified only as "Gordo"—had contacted him when he arrived in Colorado Springs, asking him to pick up another vehicle in Denver and haul it to Nebraska. But Butler did not know the location of his destination in Nebraska. When asked for further information, Butler said he had met Gordo at an auto auction and had previously hauled vehicles for him. He gave Trooper Gebauer inconsistent information about his compensation for hauling the Ford Fusion, stating both that he was doing it for a friend for free and that Gordo had paid him $2,000.

3

Trooper Gebauer noted Butler's presence on I-80 near Cheyenne, rather than the more direct route from Denver to Nebraska on I-76. He also observed that Butler's description of his previous travel seemed compressed given the duty hour limits for a commercial truck driver.

Over the course of their discussions, Butler gave Trooper Gebauer three different explanations for not having the necessary paperwork related to the Ford Fusion: (1) he did not need paperwork, (2) he had it electronically but could not retrieve it on his phone because he was unable to get AT&T cell service in the mountains (even though he was no longer in the mountains), and (3) the paperwork had blown out of the tow truck. Trooper Gebauer observed Butler using his phone at various times during their interactions.

Butler told Trooper Gebauer that the Ford Fusion was an insurance salvage vehicle, but the Trooper did not notice any obvious damage to the car. Trooper Gebauer determined that the Ford Fusion was titled to someone in Rio Linda, California. According to his driver's license, Butler was also from Rio Linda.

In addition to conducting the Level 1 inspection, Trooper Gebauer wanted to check whether the total gross weight of Butler's tow truck and the Ford Fusion exceeded 26,000 pounds, in which case he would need a fuel tax permit. The Trooper therefore directed Butler to relocate to a port of entry (POE) that was fewer than five miles away. Further, based upon Butler's responses to his questions and the circumstances he observed, at 10:12 a.m. Trooper Gebauer also asked dispatch to send a drug-sniffing dog to the POE.

4

Trooper Gebauer and Butler proceeded to the POE at 10:14 a.m., arriving there at 10:20. While driving, the Trooper learned that Butler was on federal supervised release. Butler's tow truck was weighed and determined to be below the fuel tax threshold. At approximately 10:26 a.m., Trooper Gebauer directed Butler to park his truck and again requested any commercial paperwork. At that time, Butler told the Trooper that he remembered where he was taking the Ford Fusion, showing him an online image of a Ford dealership in Omaha, Nebraska.

A sheriff's deputy arrived at the POE at 10:28 a.m. and immediately deployed a drug-sniffing dog. At that time, Trooper Gebauer was still searching for Butler's USDOT number in a federal database. He explained that, due to the common name of Butler's towing business, he had initially located several potentially valid USDOT numbers. The drug-sniffing dog alerted near the Ford Fusion at 10:35 a.m. Seconds before the alert, Trooper Gebauer received Butler's criminal history, which revealed prior drug-trafficking convictions.

Trooper Gebauer and the sheriff's deputy proceeded to search the Ford Fusion, eventually finding suspected narcotics concealed behind the rear passenger seat. A full-scale search discovered a manufactured hidden compartment at that location containing multiple packages. Police officers field tested and took custody of approximately 21 kilograms of methamphetamine, 3 kilograms of heroin with varying mixtures of fentanyl, 2.5 kilograms of cocaine, 1 kilogram of fentanyl, and 23 grams of crack cocaine. Officers also seized Butler's cell phones.

### B.    Federal Charges and Further Investigation

Butler was arrested on state charges on May 14, released on bond, and then rearrested on federal charges on May 22.  A superseding indictment charged Butler with possession with intent to distribute and conspiracy to distribute methamphetamine, heroin, cocaine, and fentanyl, in violation of  21 U.S.C. §§ 841(a)(1), (b)(1)(A) and (B), 846, and 851.

Federal agents obtained call records for Butler's cell phones and investigated the telephone numbers he had contact with and the location of his phones both before and after his arrest on May 14.  The agents determined that Butler had communicated with phones belonging to drug traffickers operating in and around the Sacramento, California area, specifically Armando Tabarez and Gabriel Lopez.  Lopez had been arrested on April 29, 2019, with prescription pills and $18,000 of suspected drug proceeds in his possession, after which Lopez began cooperating with federal agents. On June 1, federal agents seized controlled substances at a suspected drug stash house located at 1 Shoal Court in Sacramento.  Tabaraz fled from the drug stash location and was arrested later that day.  The agents believed that certain cell phone communications between Butler, Tabarez, and/or Lopez related to a drug trafficking conspiracy.

### C.    Motion to Suppress

Butler moved to suppress the evidence seized during the traffic stop.  He conceded that Trooper Gebauer permissibly stopped him for not displaying a USDOT number and was permitted to inquire about his paperwork and ticket him for any

6

violations. But he argued Trooper Gebauer unreasonably extended a routine traffic stop by redirecting him to the POE without legal justification. Butler contended the Trooper had no reason the believe the truck's weight exceeded the fuel tax threshold and had no other basis to order him to proceed to the POE. He maintained that Trooper Gebauer had directed him to the POE to buy time until the arrival of the drug-sniffing dog. Butler further argued that Trooper Gebauer's extension of the traffic stop was not justified by a reasonable suspicion that he was involved in drug trafficking.

The district court held, based on the totality of the circumstances, that Trooper Gebauer had a reasonable suspicion Butler was engaged in illegal activity. The court further found that the Trooper had legal authority to direct Butler to the POE to conduct a Level 1 commercial vehicle inspection.[1] The court held that the timing of the deployment of the drug-sniffing dog under these circumstances did not prolong the Level 1 inspection to infringe upon Butler's Fourth Amendment rights.

Regarding reasonable suspicion of illegal activity, the district court pointed to the following:

- the lack of a bill of lading for the Ford Fusion and Butler's inconsistent and non-credible explanations for not possessing the necessary paperwork;

- the absence of a logbook and documentation of operating authority for the tow truck;

---

[1] Butler does not challenge on appeal the district court's holding that Trooper Gebauer had legal authority to direct him to relocate the tow truck to the POE.

- Butler's travel history and plans, including the compressed timeline of his reported travel route in light of his duty-hour limit, his lack of knowledge regarding his destination in Nebraska, and his presence on I-80 rather than the more direct route between Denver and Nebraska;

- Butler's evasiveness when asked for further information about Gordo;

- the unlikelihood that someone would pay the high cost of hauling a salvage vehicle hundreds of miles from one state to another on a single-car commercial tow truck;

- the unlikelihood that a salvage vehicle titled in Rio Linda, California, would coincidentally end up in Denver and be transported by Butler, whose hometown is also Rio Linda;

- Butler's possession of an unexecuted title for the Ford Fusion, which Trooper Gebauer testified was uncommon based on his prior experience with traffic stops, car carriers, and the salvage industry;

- the removal of only the rear license plate from the Ford Fusion, which suggested a desire to prevent license plate readers from checking the vehicle's registration;

- the thick layer of dirt and grime on the Ford Fusion, including both windshields, given that Gordo had reportedly driven the car to Denver for pick up by Butler; and

- Butler being on federal supervised release.

The court therefore denied Butler's motion to suppress.

### D.    Pretrial Hearing Regarding Co-conspirator Statements

The district court held a so-called *James* hearing[2] to consider whether certain communications between Butler, Tabarez, and/or Lopez were admissible as co-conspirator statements made "during and in furtherance of the conspiracy" pursuant to Federal Rule of Evidence 801(d)(2)(E). For the proffered statements to be admissible, the district court stated it must find "by a preponderance of evidence that, one, a conspiracy existed; two, the declarant and the defendant were both members of the conspiracy; and three, the statements were made in the course of and in furtherance of the conspiracy." R., Vol. IV at 94. Addressing the first two issues, the court found that a conspiracy existed and that it "involved at a minimum Mr. Gabriel Lopez . . . . In addition it involved Mr. Tabarez, who was identified and in contact with the defendant. There were other individuals."[3] *Id.* at 95. The court then proceeded to address particular communications, finding that those in the government's Exhibits 2 and 3, as well as part of Exhibit 6, qualified as co-conspirator statements. It found that other proffered communications might also qualify but reserved ruling at that time pending further evidence at trial.

---

[2] *See United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979).

[3] The district court also found the conspiracy included a "Mr. Hernandez," R., Vol. IV at 95, a name identified as an alias for Lopez on Tabarez's phone, *see id.* at 67.

### E.     Conviction and Sentence

The only issue at trial was whether Butler knew about the drugs concealed in the Ford Fusion he was transporting.  A jury found Butler guilty on all charges, and the district court sentenced him to concurrent terms of 240 months' imprisonment on each count.

## II.     Discussion

On appeal, Butler challenges the district court's denial of his motion to suppress and the use at his trial of the co-conspirator statements that the district court held were admissible at the *James* hearing.

### A.     Denial of Motion to Suppress

In reviewing the district court's denial of Butler's motion to suppress, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Pettit*, 785 F.3d 1374, 1378-79 (10th Cir. 2015).  "[A] lawful traffic stop may not extend beyond the time reasonably required to effectuate its purpose," and "[c]ontinued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a reasonable suspicion that the detained person is engaged in criminal activity." *Id.* at 1379 (internal quotation marks omitted).  Butler argues that (1) the drug-sniffing dog arrived after any regulatory or commercial justification for the traffic stop had been resolved, abandoned, or was not pursued with the requisite diligence, and (2) the facts did not

10

give rise to a reasonable suspicion of criminal activity.  We need not address Butler's

first contention because we hold that Trooper Gebauer had a reasonable suspicion

that Butler was engaged in illegal activity.

Reasonable suspicion requires "a particularized and objective basis for

suspecting criminal conduct under a totality of the circumstances."  *Id.* (internal

quotation marks omitted).  "[It] is not, and is not meant to be, an onerous standard."

*Id.* (internal quotation marks omitted).  Moreover, "[w]e defer to all reasonable

inferences made by law enforcement officers in light of their knowledge and

professional experience distinguishing between innocent and suspicious actions."  *Id.*

Butler argues the factors relied on by the district court do not provide a

sufficient legal basis for reasonable suspicion.  His contentions largely assert that his

conduct and the circumstances were consistent with innocent travel.  But "an officer

need not rule out the possibility of innocent conduct, or even have evidence

suggesting a fair probability of criminal activity."  *Id.* (internal quotation marks

omitted).

Butler first contends his lack of documentation and failure to comply with

commercial trucking requirements do not support a finding of reasonable suspicion

because Trooper Gebauer testified it was not uncommon for a trucker not to

understand or follow all regulations.  But this assertion fails to construe the record in

11

the light most favorable to the government, as Trooper Gebauer testified that the extent of Butler's lack of industry knowledge was unusual. *See* R., Vol. IV at 1137.

Butler argues his inability to retrieve documentation electronically was not implausible or suspicious because "[h]aving intermittent or poor cell service on the AT&T network while traveling out of state or while driving through Wyoming is a common experience." Aplt. Opening Br. at 38. Setting aside that Butler provides no record citation for this assertion, it also ignores that Trooper Gebauer found his specific explanation—lack of cell service in the mountains—suspicious because Butler was not in the mountains when stopped on I-80.

Butler also argues there was nothing implausible or suspicious about his travel route from Colorado to Nebraska via Wyoming. He notes this court has been reluctant to deem travel plans implausible simply because they are unusual, strange, or atypical. *See United States v. Simpson*, 609 F.3d 1140, 1149 (10th Cir. 2010). But he overlooks Trooper Gebauer's reasoning that the choice of a longer route was inconsistent with a commercial truck driver's economic interests. *See Pettit*, 785 F.3d at 1382 (noting defendant's travel plans were not sufficiently implausible "to independently suggest criminal activity, [but] were worthy of consideration alongside several other suspicious factors").

Butler maintains that transporting a single vehicle a long distance is not suspicious, pointing to trial testimony by the general manager of a towing company that he had transported a single vehicle on a flatbed tow truck from Casper, Wyoming, to Fort Collins, Colorado. But once again, Butler fails to consider the

12

entire testimony, in which the witness stated that particular transport involved a high-end vehicle, which contrasts with a Ford Fusion. *See* R., Vol. IV at 397-98. The same witness also testified that, because cost is the biggest consideration, light duty vehicles are generally transported long distances by a multiple-car hauler. *See id.* at 394, 396-97.

Butler next challenges the removal of the rear license plate on the Ford Fusion as a factor supporting reasonable suspicion. He asserts that the front plate would also have been removed if the intent was to prevent law enforcement from checking the car's registration. Trooper Gebauer, however, focused on the inability of license plate readers to capture the plate number on the roadway. As to the dirty state of the Ford Fusion, Butler argues it had been driven through a dusty, rural area to get to Denver. But he provides no record citation supporting this assertion. And he fails to address the district court's reasoning that the extent of the dirt and grime on the car's windshields was inconsistent with Gordo having driven it to the location where Butler picked it up in Denver.

Butler is correct that Trooper Gebauer's knowledge he was on federal supervised release was not enough, by itself, to support a reasonable suspicion of criminal activity. *See Simpson*, 609 F.3d at 1147. But "in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus." *Id.* (internal quotation marks omitted).

Finally, Butler contends that several factors weigh against reasonable suspicion, including his compliance with Trooper Gebauer's directions; his valid

13

driver's license and registration, and what turned out to be a valid USDOT number; the fact he did not flee, act suspiciously, or try to destroy evidence; and the lack of any indication there were drugs in the Ford Fusion prior to the drug dog alert. "[W]e have held that courts must look at factors weighing against reasonable suspicion as well as factors supporting such a finding." *Pettit*, 785 F.3d at 1383. But our analysis must consider the totality of the circumstances, and taken as a whole, the facts as observed by Trooper Gebauer establish a reasonable suspicion of criminal activity. Moreover, the overall length of Butler's detention until the drug dog alerted— approximately 32 minutes—did not violate his Fourth Amendment rights. *See, e.g.*, *United States v. Cervine*, 347 F.3d 865, 872-73 (10th Cir. 2003) (upholding denial of motion to suppress where officer had reasonable suspicion and detention awaiting canine search lasted 50 minutes).

Butler has not demonstrated error in the district court's denial of his motion to suppress.

### B.     Admission of Co-conspirator Statements

Butler contends the district court erred in admitting certain out-of-court statements by his co-conspirators as non-hearsay pursuant to Rule 801(d)(2)(E). Under that Rule, the district court must determine by a preponderance of the evidence that (1) "a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994) (internal quotation marks omitted). The court must state its findings

14

on these issues on the record. *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017). We review the district court's findings of fact for clear error. *See Urena*, 27 F.3d at 1490. "Clear-error review asks whether, on the entire evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed." *Alcorta*, 853 F.3d at 1138 (10th Cir. 2017) (internal quotation marks omitted).

The district court found at the pre-trial *James* hearing that certain statements by Tabaraz and Lopez were made in furtherance of a drug trafficking conspiracy. Butler challenges the admission of these statements at the trial, arguing the court failed to make the necessary finding during the hearing that he was part of a conspiracy with Tabarez and Lopez, and if the court made such a finding, it was clearly erroneous.

Butler contends the district court found during the *James* hearing only that Lopez, Tabarez, and "other individuals" were involved in a conspiracy, R., Vol. IV at 95, and failed to make a finding on the record that Butler was involved in the same conspiracy. We disagree. The court was explicitly considering the question whether "the declarant and the defendant were both members of the conspiracy." *Id.* at 94. Although its finding on that issue could have been more clearly stated, we read it as addressing which other individuals—specifically Lopez and Tabarez—were involved in a conspiracy *with Butler*. In any event, any error was cured by the district court's finding by a preponderance of the evidence at trial "that a conspiracy existed between at least Mr. Butler and Mr. Lopez, Mr. Armando Tabaraz and others." *Id.* at 825; *see*

15

*United States v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998) (holding district court may satisfy prerequisites for admission of co-conspirator statements through a *James* hearing or at trial).

Butler argues the district court's finding that he was involved in a conspiracy with Tabaraz and Lopez was clearly erroneous because the government failed to show a mutual benefit between the drug dealers and Butler. *See United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (holding government must show "the alleged coconspirators were interdependent," meaning they "inten[ded] to act together for their shared mutual benefit within the scope of the conspiracy charged" (internal quotation marks omitted)). Thus, "[w]e . . . consider whether the activities of the alleged coconspirators were advantageous to the activities of other coconspirators, or the success of the venture as a whole." *United States v. Rutland*, 705 F.3d 1238, 1250 (10th Cir. 2013).

We are not left with a definite and firm conviction that the district court erred. It found that the conspiracy between Butler, Tabarez, and Lopez involved both "the transportation and distribution of drugs" and "the travel from Sacramento down to . . . the L.A. area for purposes of re-upping or reloading with drugs." R., Vol. IV at 825. Lopez testified that Butler met Tabarez in prison, and after their release, Butler "knew some people that needed the drugs that we had, and so Tabarez started selling them to him." *Id.* at 778. Lopez supplied Butler with drugs seven or eight times— including three pounds of methamphetamine on May 12, 2019, two days before Butler's arrest. Lopez made that delivery to Butler at a Taco Bell restaurant parking

lot near the stash house at 1 Shoal Court. Lopez testified that Tabarez was the source of all drugs he supplied to Butler and that the drug deliveries were done at Tabarez's direction. He also testified that he sometimes collected money from Butler.

Butler's phone communications and the locations of his phones further supported the conclusion he was involved in a drug-related conspiracy with Tabarez and Lopez. That evidence and reasonable inferences therefrom showed that Butler twice drove from Sacramento to the Los Angeles area in April and May of 2019 to pick up drugs for Tabarez. When Butler arrived in Los Angeles on the second trip, Tabarez texted him a phone number that federal agents later connected to a separate drug trafficking investigation. Butler communicated with that phone number and received a text with the address of a restaurant. On both trips, after very short stops in southern California, Butler returned to Sacramento and the vicinity of the Taco Bell and stash house, which was 13 miles from his home in Rio Linda. During these trips, Butler's phones had numerous contacts or attempted contacts with Tabarez's phones, including one call with Tabarez while Butler was near the stash house.

Butler was also in the vicinity of the stash house at other times, including on May 12, the date Lopez supplied him with three pounds of methamphetamine. On those days, he communicated with Tabarez and Lopez, from near the stash house and from other locations. In addition, Tabarez and Lopez discussed the delivery of three pounds of methamphetamine to Butler in text messages on May 12.

Further, Butler communicated with Tabarez after his release from state custody and before he was re-arrested on federal charges. Tabarez texted Butler a

17

screen shot of a news article about a 2016 drug arrest of a person named Ray Rodriguez in Colorado Springs, Colorado. Shortly thereafter, Butler was recorded on a jail phone call asking his wife to create a bill of lading indicating he was paid $2,000 to tow a car for Ray Rodriguez and stating he was not responsible for the contents of the towed car.

Butler fails to demonstrate that the district court clearly erred in finding that he was involved in a drug conspiracy with Tabarez and Lopez. Consequently, he does not show error in the admission of the challenged co-conspirator statements at trial.

## III.   Conclusion

We affirm the district court's judgment.

Entered for the Court


Joel M. Carson III
Circuit Judge