NOT DESIGNATED FOR PUBLICATION

No. 125,283

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GINA L. WILSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Submitted without oral argument. Opinion filed December 29, 2023. Affirmed.

*Grace E. Tran*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, P.J., GARDNER and HURST, JJ.

WARNER, J.: Gina Wilson appeals her conviction for illegal possession of an opiate. She argues the district court should have granted her motion to suppress evidence of oxycodone pills found in her car during a traffic stop, arguing police officers only found that evidence after they impermissibly extended the scope and duration of the stop. She also asserts the State failed to prove that oxycodone is an opiate under K.S.A. 2019 Supp. 21-5706(a). We are not persuaded by these arguments and thus affirm Wilson's conviction.

1

FACTUAL AND PROCEDURAL BACKGROUND

In March 2022, a jury convicted Wilson of possession of an opiate under K.S.A. 2019 Supp. 21-5706(a) and driving while suspended, her second or subsequent conviction. (She does not challenge the suspended-driving conviction on appeal.) The events giving rise to Wilson's convictions took place on November 19, 2020, when she was pulled over by Wichita police officers while driving in Sedgwick County. During the course of the stop, the officers found an envelope of oxycodone capsules in Wilson's car, leading to her drug-possession conviction.

*The stop*

Before trial, Wilson moved to suppress all evidence relating to the oxycodone, claiming that the evidence arose from a violation of the United States Constitution's prohibition of unreasonable searches and seizures. The district court held a hearing on that claim, and the testimony presented there forms the basis for the following narrative.

The Wichita police had previously received information that made them believe that a person named Rita was selling crack cocaine from a residence in Wichita. Police officers had begun watching the house in September 2020 and observed patterns they believed signaled drug trafficking (such as cars pulling up and leaving within three to five minutes). The day before Wilson was stopped, officers pulled trash from the home, finding torn baggies with what they believed to be drug residue on them.

On the day of Wilson's traffic stop, two officers—Officer Donald Bailey and Officer Shawn Isham—were observing the suspected drug house. Around 4:30 p.m., they saw a car pull into the driveway. A woman later identified as Wilson exited the car and entered the house, reappearing within three to five minutes. The car then drove away.

2

The officers followed the car and saw it commit two traffic infractions—failing to signal a turn and failing to signal a turn within 100 feet. The officer who was driving activated his emergency lights, and the car immediately pulled over, stopping in front of a house on Greenfield Street. The officers approached the car (at 4:36 p.m.) and observed that Wilson was its the sole occupant.

The officers and Wilson discussed what had happened. Wilson was adamant that she had properly signaled but admitted she did not have a valid license. She explained that she had been thinking about renting a property on Greenfield Street—in fact, the very property she happened to have been stopped in front of—and had stopped at her friend Rita's house to ask for directions. The officers found it suspicious that Wilson claimed to be pulled over right in front of her prospective rental home immediately after being at the suspected drug house and speaking with Rita.

After this initial contact, the officers returned to the patrol car. Officer Bailey confirmed Wilson's suspended license and identity. He also conducted a search of her criminal history, showing she had a few arrests for possession of narcotics. The officers called a K-9 unit—consisting of an officer-handler and dog, Oden—to the scene (at 4:42 p.m.). Officer Bailey indicated that this was "right about the time" one of his systems indicated Wilson had a suspended driver's license and "probably right before [he] got onto SPIDER to confirm the [suspended license] and to check to see if she had any other warrants."

At this point, the officers had reason to believe that Wilson had committed at least one crime—driving with a suspended license. Officer Isham got out of the patrol car and asked Wilson to step out of her vehicle. Officer Bailey waited for information from SPIDER and began filling out the citation.

The K-9 unit arrived at 4:51 p.m., nine minutes after it was called. Officer Bailey testified that he completed the citation "a little bit after the K-9 arrived." The K-9 unit waited for about 40 seconds for him to complete the citation. When Officer Bailey finished the citation, he stepped out of his patrol car to join the K-9 unit. Four minutes later, at 4:55 p.m., the dog indicated that there were drugs in the car. The officers then searched Wilson's vehicle, finding 30 white capsules inside an envelope in the center console. A forensic lab later identified these capsules as oxycodone.

*Wilson's charges, suppression motion, and convictions*

The State charged Wilson with one count of possession of an opiate, opium, narcotic, or certain simulant; one count of driving while suspended, her second or subsequent conviction; and one count of unsafe turning or stopping, failure to give proper signal.

Before trial, Wilson sought to suppress the oxycodone capsules found in her car. She argued that the officers impermissibly extended the traffic stop by calling the drug dog. Wilson pointed out that she did not consent to the search and argued that her criminal history alone could not create reasonable suspicion to extend the stop. The State countered that calling the K-9 unit did not measurably extend the stop. And the State suggested Wilson's stop at the surveilled house, her drug history, and her suspicious explanation about stopping in front of the house she was looking at to rent provided reasonable suspicion to complete the K-9 sniff.

As we have noted, the district court conducted an evidentiary hearing on Wilson's suppression motion. After considering the evidence, the court declined to suppress evidence of the oxycodone. In the court's written order, it stated that Wilson was not detained for an unreasonable period of time since the dog arrived before the officer completed the citation paperwork.

A jury found Wilson guilty of possession of an opiate and driving while suspended. She now appeals.

DISCUSSION

Wilson raises two issues on appeal. First, she argues the district court should have suppressed the oxycodone capsules found in her car because they were only found because the officers impermissibly extended the traffic stop. Second, Wilson argues there was not sufficient evidence to convict her of possession of an opiate, asserting the State failed to prove that oxycodone is an opiate under K.S.A. 2019 Supp. 21-5706(a). We find neither argument persuasive.

1. *The district court did not err by denying Wilson's motion to suppress evidence of the oxycodone.*

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment's Due Process Clause, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010). When a person is stopped by a police officer for a traffic infraction, a seizure occurs under the Fourth Amendment. *State v. Jimenez*, 308 Kan. 315, 316, 420 P.3d 464 (2018).

"Traffic stops must not be measurably extended beyond what is necessary to process the infraction prompting the stop, unless there is reasonable suspicion of or probable cause to believe there is other criminal activity, or consent." 308 Kan. at 316 (citing *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 191 L. Ed. 2d 492 [2015]). This necessary information usually includes "checking the driver's license,

5

determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." 575 U.S. at 355. Investigation into other crimes "diverts from that mission and cannot become a permissible *de minimis* intrusion" unless the officers have facts causing them to suspect that some other crime has been committed. *Jimenez*, 308 Kan. at 317 (citing *Rodriguez*, 575 U.S. at 355-57).

Under Kansas law, police may ask questions of a stopped driver about matters unrelated to the stop so long as they do not extend the traffic stop "'beyond the time reasonably required to effectuate [the stop's] purpose.'" 308 Kan. at 329 (quoting *United States v. Pettit*, 785 F.3d 1374, 1379 [10th Cir. 2015]). Officers must be "especially careful to ensure nonconsensual inquiries occur concurrently with the tasks permitted for such stops so they will not measurably extend the time it would otherwise take." *Jimenez*, 308 Kan. at 326. This is called multitasking. 308 Kan. at 326. If an officer is not effectively multitasking, these unrelated inquiries—without reasonable suspicion, probable cause, or consent—impermissibly expand the stop beyond what the Constitution permits. 308 Kan. at 325-26.

Wilson argues that the district court erred in declining to suppress evidence of the oxycodone, asserting the police officers lacked reasonable suspicion to extend the stop beyond traffic-related issues. In doing so, she renews the argument she raised at the suppression hearing, claiming the K-9 sniff extended the duration of the stop beyond what was constitutionally permitted. She also adds a new argument, raised for the first time on appeal, that the officers impermissibly extended the duration of the stop when they checked her criminal history. We address the reasons why we decline to consider this new argument before reviewing Wilson's challenge to the district court's ruling.

### 1.1. *Wilson's argument that the criminal-history check extended the stop is not preserved for appeal.*

Appellate courts are courts of review. This means we ordinarily only consider claims that were preserved in earlier proceedings—most often, claims that were first presented to the district court. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018); *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). This preservation requirement serves several practical purposes. Most notably, it allows the district court the opportunity to consider and rule on the parties' claims, thereby reducing the chance of reversible error and the need for a new trial. It also allows the parties the opportunity to create a comprehensive trial record, ensuring a more meaningful review on appeal.

When a party presents an issue on appeal that was not raised before, it deprives the district court of the ability to consider the argument and conduct an error-free proceeding. It also deprives the appellate court of a complete record to review, as there are no previous arguments to consider and no decision by the district court to evaluate. We occasionally exercise our discretion to reach an unpreserved argument if we find that the issues warrant our review and if review is possible based on the record before us. *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017). For example, we have sometimes decided to consider purely legal issues raised for the first time on appeal if they are based on undisputed facts and would resolve the case or if the record permits review and deciding the issue is necessary to serve the ends of justice or prevent deprivation of a fundamental right. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019).

Wilson's argument that the officers measurably extended the traffic stop by checking her criminal history was not argued before the district court. A review of the record shows that while Wilson mentioned her criminal history, she did so in the context of whether it created reasonable suspicion for the K-9 unit to conduct a sniff—not whether it measurably extended the stop. These are different arguments requiring

different factual evaluations. As such, the parties offered little, if any, evidence regarding the manner in which the officers conducted her criminal-history search, and the district court made no findings about whether the manner of that search meaningfully and impermissibly extended the stop.

Despite this change of course, Wilson does not acknowledge in her appeal that this argument is new, nor does she present us with any reasons why we should consider this question in the first instance. See Supreme Court Rule 6.02(a)(5) (2023 Kan. S. Ct. R. at 36) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court."); see also *State v. Godfrey*, 301 Kan. 1041, Syl., 350 P.3d 1068 (2015) (failure to satisfy Rule 6.02[a][5] results in an abandonment of the issue). We decline to consider this fact-intensive argument for the first time on appeal.

### 1.2. *The K-9 sniff did not measurably extend the traffic stop.*

Apart from her new argument about the criminal-history check, Wilson briefly revisits her assertion that the stop was unconstitutionally prolonged by the time it took the K-9 unit to indicate that there were drugs in her car. She points out that the K-9 unit arrived at 4:51 p.m., essentially just as Officer Bailey completed the citation, and the dog alerted next to the car four minutes later. Wilson argues that she should have received her traffic citation when Officer Bailey completed it—which was about 40 seconds after the drug dog arrived—and had been allowed to leave. The State counters that the time it took the dog to sniff Wilson's car did not measurably extend the stop, meaning no constitutional violation occurred. We agree with the State.

This court reviews the factual underpinnings of a district court's decision to deny a suppression motion for substantial competent evidence and its ultimate legal conclusion de novo. *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). When, as here, the material facts are not in dispute, the constitutionality of a search is a question of law over

which our review is unlimited. *State v. Stevenson*, 299 Kan. 53, 57-58, 321 P.3d 754 (2014). Although a defendant initiates a constitutional challenge to a search or seizure by filing a motion to suppress the evidence in question, the State has the burden to prove any challenged police conduct was permissible. K.S.A. 2022 Supp. 22-3216(2); *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016).

Because a dog sniff is not a routine traffic measure, it is constitutionally permissible during a traffic stop "as long as [the dog sniff] did not prolong the stop beyond the time necessary to accomplish the original purpose of issuing a traffic citation." *State v. Jones*, 300 Kan. 630, 641, 333 P.3d 886 (2014). In analyzing the lawfulness of a dog sniff during a traffic stop, our focus "is not whether the dog sniff occurs before or after the officer issues a ticket," but rather "whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Rodriguez*, 575 U.S. at 357.

The State correctly notes that Wilson points to no evidence showing that the dog sniff measurably extended the stop beyond the time that was required to accomplish the stop's original purpose. The roughly four minutes between the completion of Wilson's traffic citation and the dog's indication of drugs do not amount to a delay that would render the stop unconstitutional. This is particularly true where the officers had already confirmed that Wilson had committed a crime (driving while suspended); Wilson's assertion that she would have been free to leave immediately upon Officer Bailey's completion of the citation is unfounded.

Because there is no evidence that the dog sniff meaningfully extended the duration of the original stop, we find no Fourth Amendment violation here. Thus, we need not address Wilson's alternative arguments regarding the officers' reasons for extending the stop and whether the oxycodone would have been inevitably found when Wilson was arrested for driving while suspended. In short, the district court did not err when it denied Wilson's motion to suppress the oxycodone found in the console of her car.

9

2. *There was evidence presented at trial to support Wilson's conviction for unlawful possession of an opiate.*

Wilson also challenges the sufficiency of the evidence to convict her of possession of an opiate. When a defendant challenges the sufficiency of the evidence, an appellate court reviews the evidence "in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Rosa*, 304 Kan. 429, Syl. ¶ 1, 371 P.3d 915 (2016). Appellate courts do not participate in the trial or observe the witnesses' testimony; we therefore do not reweigh the evidence, resolve evidentiary conflicts, or reassess witness credibility. *State v. Keel*, 302 Kan. 560, 566, 357 P.3d 251 (2015).

Wilson claims that she could not be convicted of unlawful possession of an opiate because the State did not prove that oxycodone—which is not specifically referenced in K.S.A. 2019 Supp. 21-5706(a)—was an "opium, opiate, or narcotic drug" within the meaning of that statute. She argues that the fact that Kansas statutes elsewhere categorize oxycodone as an opiate (see K.S.A. 65-4107[b][1]) is not sufficient to render possession of oxycodone in all instances a crime under K.S.A. 2019 Supp. 21-5706(a), particularly when the criminal complaint does not reference that other statutory section.

While Wilson makes an interesting argument about statutory interpretation, we find it unnecessary to resolve because the State presented testimony at trial that oxycodone is an opiate. This testimony provided a basis from which the jury could conclude that Wilson unlawfully possessed an opiate.

At trial, two witnesses specifically addressed whether oxycodone was an opiate. A program manager from the State Board of Pharmacy testified twice that oxycodone "is a Schedule II [drug]," and a Sedgwick County forensic chemist testified that "both

10

[oxycodone and hydrocodone] are classified as a narcotic or an opiate drug." Given our deference to the jury's assessment of the evidence, these statements support the jury's finding that the substance Wilson possessed—oxycodone—was an opiate.

We note that a panel of this court recently considered a similar question in *State v. Caldwell*, No. 124,476, 2022 WL 17174569, at *9-10 (Kan. App. 2022) (unpublished opinion), *petition for rev. filed* December 14, 2022. The *Caldwell* panel held that the State proved that hydrocodone and morphine were drugs criminalized under K.S.A. 2018 Supp. 21-5706(a)—although like oxycodone, they are not explicitly referenced in the statute—because an officer in that case had "testified that hydrocodone and morphine are 'Schedule II narcotics.'" 2022 WL 17174569, at *10. Wilson does not meaningfully distinguish her case from *Caldwell*, and we see no reason to depart from the panel's reasoning there.

There was evidence presented at trial to show that Wilson unlawfully possessed an opiate. We affirm her conviction for that offense.

Affirmed.